**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**KATHRYN ANN HEMETEK,**

      **Movant,**

**v.**                                                    **Civil Action No. 3:11-cv-00579
(Criminal No. 3:08-cr-00198)**

**UNITED STATES OF AMERICA,**

      **Respondent.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court is Movant's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255. (ECF No. 67). This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and by Standing Order has been referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the undersigned respectfully **RECOMMENDS** that the presiding District Judge deny Movant's Motion, dismiss this civil action, with prejudice, and remove it from the docket of the Court.

### I.    Background

On February 10, 2005, Sergeant E.B. Starcher of the West Virginia State Police ("WVSP") received an anonymous letter at the WVSP detachment in Mason County, West Virginia, which indicated that Movant, Kathryn Ann Hemetek ("Hemetek"), an

employee at New Haven Elementary School in Mason County, was using school computers to communicate with a website that purportedly supplied marijuana seeds for cultivation.[1] (ECF No. 60 at 116). Attached to the letter were print-outs of electronic mail correspondence between an individual with the e-mail address of khemetek@hotmail.com and an individual with an e-mail address of seedorders@medicalseeds.com. (*Id.* at 116-17). The first e-mail message was undated and sent from khemetek@hotmail.com to seedorders@medicalseeds.com and read:

> I placed an order in March and my check has been cashed #471 for $350. Could I please have my order or my money back. K. Hemetek, Rt. 1 Box 156, Letart, WV, 25253.

(ECF No. 38-11 at 1-2). The reply message from seedorders@medicalseeds.com was dated April 28, 2004:

> Greetings, the hold on your cheque was recently removed and your order was shipped. Next time if you wish faster service do not send a payment via cheque. Peace Mary.

(*Id.*). The third message was also undated and was sent from khemetek@hotmail.com:

> The seeds I got were bad – only two out of 20 came up and I had got some from a friend (which cost me nothing) and they all came up. I am asking for a refund of $350 or I am going to post it on the internet site.

This message did not have an electronic signature but did include Hemetek's address, Rt. 1, Box 156, Letart, WV, 25253. (*Id.*). The final reply was dated June 15, 2004 and stated:

> Greetings, we guarantee 80% germination simply send back the seeds that do not germinate and we can re-ship. Mary.

---

[1] Citations in the factual history refer to documents found in *United States of America v. Kathryn Ann Hemetek,* Case No. 3:08-cr-00198,which are identified by docket number.

Sgt. Starcher assigned Cpl. Brent L. Keefer to investigate the allegations in the letter. (ECF No. 60 at 116-17). Subsequently, Cpl. Keefer contacted the Mason County Board of Education, reported the allegation, and conducted interviews of potential witnesses. (*Id.* at 106, 116-18, 129). At the same time, the Board of Education instructed its Human Rights Officer, Ms. Linda Rollins, to initiate an investigation into the improper use of school computers. School employees, Angela Roach and Blythe Powell, were identified as the individuals who discovered the e-mails on a computer in the school's computer laboratory. According to the subsequent trial testimony of Roach and Powell, on February 7, 2005, a student began using a computer in the laboratory that had been in "sleep" mode. (*Id.* at 88-90). The computer opened to Hemetek's e-mail account login screen in which the password was already entered. (*Id.*). Roach proceeded to log on to the account and found the messages that were later sent anonymously to Sgt. Starcher. (*Id.*). Roach, unsure of what to do with the messages, notified Powell, who examined the e-mails and then reported the incident to the school's principal. (*Id.* at 90-91, 102).

In the course of her investigation, Ms. Rollins interviewed Hemetek several times regarding the e-mails discovered on the school's computer. (*Id.* at 107-109). Hemetek acknowledged that the e-mail address was hers, but adamantly denied having sent the messages or having any knowledge of the website. (*Id.*). Hemetek allegedly reported to Rollins that her e-mail address and password were well-known at the school and suggested that someone else must have used her account to make it appear as though she had sent and received the e-mails. (ECF No. 43 at 5; ECF No. 60 at 108-09).

On the basis of the foregoing information, the WVSP placed its investigation on hold, but decided to perform a targeted inspection of Hemetek's farm during their marijuana eradication efforts scheduled for the summer of 2005. (ECF No. 60 at 119). Consequently, on July 22, 2005, Sgt. Starcher conducted aerial reconnaissance of Hemetek's farm and spotted marijuana growing adjacent to Hemetek's property. (*Id* at 26). Sgt. Starcher informed Cpl. Keefer of this information, and Cpl. Keefer led a detachment of WVSP officers to Hemetek's farm to investigate on foot. (*Id.* at 120-22). Upon arriving at the farm, Cpl. Keefer observed Hemetek's father and son working in the front yard, although Hemetek was not present at the time. (*Id.*). Cpl. Keefer requested permission to search the farm and was granted permission to do so by Hemetek's son, Richard Lockhart. (*Id.* at 124; ECF No. 38-11 at 6). In a subsequent statement to Keefer, Lockhart volunteered that his mother and her ex-husband, Vaughn Johnson, had grown marijuana on the farm in the past. (ECF No. 60 at 66-67). Lockhart also shared his suspicion that Hemetek was again involved in the cultivation of marijuana. (ECF No. 84 at 57).

Cpl. Keefer and other members of the WVSP began a foot search of the farm and located marijuana plants growing in three large plots. Two plots were on Hemetek's property and one plot was adjacent to the property line.  (ECF No. 60 at 30-39).  The first plot contained 105 plants and was located a short distance across Hemetek's upper fence line in an unimproved area of pine trees and underbrush. (*Id.*) The officers observed a path leading through the brush from Hemetek's property to the plot. (ECF No. 61 at 7-9). The second plot contained 45 randomly situated marijuana plants in an open pasture, and the final plot was located closer to Hemetek's barn and contained 69 plants.  (ECF No. 60 at 30-39).  In one of the plots,

- 4 -

the officers found water jugs and planters with marijuana plants growing in them. (ECF No. 61 at 11-12). The officers began eradicating the plants. As they pulled the marijuana plants out of the ground, they noted dark soil around the roots, consistent with the use of potting soil or fertilizer. (*Id.* at 10).

Hemetek arrived at the farm several hours after the police had begun their search of the property. At that time, Cpl. Keefer advised Hemetek of her Miranda rights. (ECF No. 60 at 134-35). Hemetek immediately stated that she wanted to consult with an attorney and was not questioned further. (*Id.*). However, Hemetek made several unsolicited comments to Cpl. Keefer in which she admitted to growing marijuana on the farm in the past, during her marriage to Vaughn Johnson, but denied that the plants found that day belonged to her. (ECF No. 60 at 135, 144). Subsequently, samples were taken from each of the 219 suspected marijuana plants and were sent to the WVSP Forensic Laboratory for analysis. Erin Feazell, a forensic chemist for the Laboratory, tested ten randomly selected samples from the 219 submitted and confirmed that all ten samples contained marijuana. (*Id.* at 57-58).

Following the eradication effort, Cpl. Keefer re-examined the exchange between Hemetek's e-mail account and medicalseeds.com. (*Id.* at 129-34). His investigation of the website confirmed that it belonged to a mail-order marijuana seed company. (*Id.*). In the website's section on "payment information," the owners of medicalseeds.com instructed customers who wished to pay by personal check to make the check payable to "Crop Circle." (*Id.*). Consequently, Hemetek's bank records were subpoenaed and reviewed by Cpl. Keefer. (*Id.* at 128-29). Bank records obtained from Farmers Bank and Savings located in Pomeroy, Ohio, reflected that Hemetek had opened a checking account in November 2003. (ECF No. 38-11 at 3-5).

Included in the bank's records was a copy of a cancelled check number 471 from that account. (*Id.* ). The check was dated March 25, 2004, was in the amount of $350, bore Hemetek's signature, and was made payable to "Crop Circle." (*Id.*).

On September 16, 2008, a federal grand jury convened in Charleston, West Virginia and returned a single-count indictment against Hemetek, charging her with cultivating 100 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1). (ECF No. 1). On October 1, 2008, Hemetek appeared with retained counsel, L. Thompson Price, before United States Magistrate Judge Maurice G. Taylor Jr. for an initial appearance and arraignment. Hemetek entered a plea of not guilty. (ECF No. 4). Approximately two weeks later, the United States sent a written plea offer to Hemetek. (ECF No. 106-2). The plea offer required Hemetek to plead guilty to the single-count indictment, which exposed her to a mandatory minimum sentence of 60 months imprisonment. Hemetek did not accept the offer. On January 8, 2009, Assistant United States Attorney ("AUSA") Josh Hanks offered to seek authorization for an information plea agreement that would not subject Hemetek to the mandatory minimum sentence, indicating in an e-mail communication to attorney Price:

> I am willing to work up the chain for approval to an 0-20 information plea. I am fairly confident that it would be approved if I'm pushing for it. I would expect it to require Ms. Hemetek to stipulate to a guideline calculation, an agreed factual basis drafted by me, an appellate waiver, and an agreement to surrender her teaching license. If your client can agree to these general terms, please let me know so that I can get approval to make an offer as quickly as possible. Thanks.

(ECF No. 79-1 at 1).

On January 13, 2009, the district court convened a jury trial. (ECF Nos. 60 and 61). The United States introduced the testimony of Sgt. Starcher, Cpl. Keefer, Trooper Joseph Finnicum, and Cpl. Kristan Gilley of the WVSP to testify regarding the

anonymous letter, followed by the discovery and eradication of 219 marijuana plants found on or near Hemetek's farm.  The United States also offered the testimony of Mason County Board of Education employees, Angela Roach, Blythe Powell, and Linda Rollins, to establish the facts leading up to the targeted inspection of the Hemetek farm. Finally, the United States called Richard Lockhart to testify regarding Hemetek's past cultivation of marijuana and his interactions with the WVSP on the day of the eradication effort. (*Id.*). The United States introduced photographs of Hemetek's farm; photographs of the plots of marijuana on and adjacent to the farm; photographs of the marijuana seized from the farm; a box of the 219 samples of marijuana collected from the farm; the e-mails exchanged between Hemetek and the website medicalseeds.com; and the negotiated check written to Crop Circle. (ECF Nos. 38 and 38-1 through 38-18).

On January 14, 2009, the jury returned a guilty verdict against Hemetek. (ECF No. 35). Prior to sentencing, Hemetek was interviewed by the United States Probation and Pretrial Services Office. (ECF No. 43). During her interview, Hemetek admitted for the first time that she had ordered the marijuana seeds off the internet, but stated that she did not do so using school property. (*Id.* at 6). Hemetek explained that she ordered the marijuana seeds for an acquaintance, Steve Jordan, and that her subsequent demand for a refund was in response to Jordan's complaint that the seeds did not grow. (*Id.*). Despite this revelation, the Probation Officer did not recommend any adjustment to Hemetek's base offense level for acceptance of responsibility. The Officer concluded that in light of the evidence presented at trial, Hemetek had been only partially truthful about her involvement in the offense.  (*Id.* at 7).

On May 11, 2009, the District Court conducted a sentencing hearing in Hemetek's case. (ECF No. 42). Prior to imposing sentence, the Court asked Hemetek if she wished to make a statement, to which she responded:

> I just know that the whole truth didn't come out and that I did not commit this crime. So I couldn't say that I did something that I didn't do, and I just think that it is unfair that I was singled out for this offense.

(ECF No. 58 at 13). After conferring privately with her attorney off the record, Hemetek added, "I mean I accept the responsibility because of the jury sentencing." (*Id.*). Hemetek's offense level was determined to be 18 based on her possession of 219 marijuana plants (21.9 kilograms). No additional enhancements or adjustments were included in the calculation of Hemetek's total offense level. Her total offense level of 18 and Criminal History Category of I resulted in a sentencing guideline range of 27–33 months imprisonment. Nevertheless, the provisions of 21 U.S.C. § 841(b)(1)(B) imposed a mandatory minimum sentence of five years (60 months). Consequently, the district court sentenced Hemetek to the mandatory minimum term of imprisonment.

On May 13, 2009, Hemetek filed a notice of appeal. (ECF No. 48). In her appeal, Hemetek raised three issues. (ECF No. 62). First, she argued that the district court erred in admitting the e-mails found on the computer at New Haven Elementary School. Hemetek claimed that the United States used the e-mails to improperly suggest "that because she had bought seeds in the past she was likely to have cultivated the plants, and because of the suspicious circumstances surrounding the discovery of the e-mail, the district court should have suppressed this evidence." Second, Hemetek argued that the district court erred when it denied her motion for

acquittal given the absence of any direct evidence connecting her with the plants that were cultivated near her farm. Hemetek asserted that the district court should have required the United States to prove her connection to the plants and should not have permitted a loose circumstantial case to proceed to verdict. Finally, Hemetek argued that she received ineffective assistance of counsel when her counsel failed to challenge the admissibility of statements given against her interest by herself and her son under Rule 404(b). Hemetek also alleged that counsel was ineffective by failing to object when Sgt. Starcher testified that he was familiar with Hemetek from "other cases." Hemetek contended that her prior dealings with Sergeant Starcher should have been the subject of a motion *in limine* by the defense and should have been objected to at trial. By a *per curiam* opinion, the Fourth Circuit Court of Appeals affirmed Hemetek's conviction and sentence. *United States of America v. Hemetek*, 393 Fed.Appx. 67 (4th Cir. 2010). With respect to Hemetek's ineffective assistance of counsel claims, the Fourth Circuit noted:

> "A claim of ineffective assistance of counsel should be raised by a habeas corpus motion under 28 U.S.C. § 2255 in the district court and not on direct appeal, unless it conclusively appears from the record that defense counsel did not provide effective representation." United States v. Richardson, 195 F.3d 192, 198 (4th Cir.1999) (internal quotation marks and alterations omitted). As the record before us does not meet this test, we decline to consider these allegations on direct appeal. Hemetek may raise them in a motion pursuant to 28 U.S.C.A § 2255 (West Supp. 2010).

*Hemetek*, 393 Fed.Appx. at 70.

On August 25, 2011, Hemetek filed her present Motion to Vacate Sentence. (ECF No. 67). In this motion, Hemetek argues that her trial counsel rendered ineffective assistance under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). On November 2, 2011, the United States filed its Response in

Opposition to Hemetek's Motion to Vacate Sentence with an attached affidavit executed by Price. (ECF No. 81). Hemetek filed a Reply to Respondent's Response, as well as a First Evidentiary Disclosure on December 19, 2011. (ECF No. 84). Given that Hemetek presented a colorable Sixth Amendment claim that required credibility determinations in order to resolve disputed material facts, the undersigned conducted an evidentiary hearing to supplement the record on March 14, 2012.[2] (ECF No. 105). Prior to the hearing, Hemetek filed a Memorandum of Law Concerning Issues Related to Evidentiary Hearing (ECF No. 104) and after the hearing Movant's counsel provided the undersigned and the AUSA with recent decisions of the United States Supreme Court on the duties of defense counsel to communicate and explain plea offers to their clients and to raise the application of the safety-valve provision at sentencing, when applicable.  Accordingly, the undersigned **FINDS** that the record is complete and the issues are well-briefed.  Thus, this matter is ready for disposition.

## II.   **Movant's Grounds for Vacating, Setting Aside, or Correcting Her Sentence.**

Hemetek identifies three broad grounds, all based on ineffective assistance of trial counsel, in support of her motion to vacate. First, Hemetek contends that trial counsel was ineffective in numerous ways in his trial strategy and cross-examination of witnesses. Second, Hemetek argues that trial counsel failed to discuss the applicability of a mandatory minimum sentence to the charge contained in the indictment and failed to inform her of a potential information plea agreement that would have allowed the District Court to impose a sentence below the 60 month

_____

[2] Hemetek has been represented by counsel throughout the course of her § 2255 motion.

- 10 -

mandatory minimum sentence. Finally, Hemetek alleges that trial counsel failed to appreciate and advise her of the applicability to her case of the "safety-valve" provision contained in 18 U.S.C. § 3553(f).[3]

## III.    __Standard of Review__

As stated *supra*, the Fourth Circuit noted in Hemetek's direct appeal that "[a] claim of ineffective assistance of counsel should be raised by a habeas corpus motion in the district court under 28 U.S.C. § 2255 and not on direct appeal, unless it conclusively appears from the record that defense counsel did not provide effective representation," citing *United States v. Richardson,* 195 F.3d 192, 198 (4th Cir. 1999) (internal quotation marks and alterations omitted). The Court found that the record did not meet that exacting test; accordingly, it declined to address the claims of ineffective assistance of counsel. Therefore, those claims are properly presented in the instant § 2255 motion.

Title 28 U.S.C. § 2255 requires a movant to prove by a preponderance of the evidence that his or her "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is

---

[3] Hemetek also complains that prior to being sentenced, she "gave grand jury testimony in the State of Ohio regarding other crimes committed by Michael Neal who is almost certainly the person responsible for planting marijuana on or near Ms. Hemetek's property. She did not receive consideration at sentencing or in a Rule 35 motion for that cooperation." (ECF No. 67 at 3). The record is clear that the United States did not make a Rule 35 motion or otherwise request a downward departure from the statutory mandatory minimum sentence based upon substantial assistance. The United States was not obligated to make either of these requests; thus, the district court could not depart from the statutory mandatory minimum sentence or question the government's decision not to move for departure unless defendant made a "substantial threshold showing" that the government's refusal was based upon an unconstitutional motive. *Wade v. United States*, 504 U.S. 181, 185-86, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992); *See also United States v. Wolfe*, 102 Fed. Appx. 286, 287 (4th Cir. 2004). Hemetek did not and has not made such a showing.

otherwise subject to collateral attack." Sixth Amendment claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Accordingly to *Strickland,* to succeed on an ineffective assistance of counsel claim, a movant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. 466 U.S. at 687–91. Movant carries the burden of satisfying both prongs of the *Strickland* test, and "a failure of proof on either prong ends the matter." *United States v. Roane,* 378 F.3d 382, 406 (4th Cir. 1994).

When conducting a review of counsel's competence, the Court must apply "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," *Wiggins v. Smith,* 539 U.S. 510, 523 (2003), and its scrutiny "must be highly deferential." *Strickland*, 466 U.S. at 689. "It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Wiggins*, 539 U.S. at 523. Hence, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from the counsel's perspective at the time." *Id.*

The second prong of the *Strickland* test is prejudice. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 694, *citing United States v. Morrison*, 449 U.S. 361 (1981). It is insufficient for the defendant "to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." *Id.* at 693. Rather, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

## IV.   <u>Analysis</u>

Hemetek fails to carry her burden of proof on all three claims of ineffective assistance of counsel because she is unable to establish by a preponderance of the evidence that trial counsel's representation fell below an objective standard of reasonableness. In evaluating the merits of the motion to vacate, the undersigned noted that Hemetek's claims fell into two distinct groups. The first, those involving counsel's performance at trial, could be determined by a review of the record without need for a credibility assessment. The second group, however, involved the substance of counsel's advice to Hemetek regarding plea and sentencing issues. Given that the record contained conflicting accounts of the communications between Hemetek and counsel, the record was supplemented at an evidentiary hearing. Having now carefully considered the record and the testimony provided at the hearing, the undersigned addresses Hemetek's claims below, beginning with those claims concerning counsel's performance at trial.

### A.     Counsel's Performance at Trial

Hemetek makes a number of ineffective assistance of counsel claims that center on counsel's strategy at trial. Specifically, Hemetek argues that counsel was ineffective when he failed to adequately cross-examine a number of witnesses and failed to present other witnesses who Hemetek contends would have provided exculpatory testimony. In response, the United States emphasizes that Hemetek suffered no prejudice from counsel's strategy, because "no amount of cross-examination would have reasonably overcome the fact that police seized 219 fully mature marijuana plants from her property." (ECF No. 83 at 11). The undersigned **FINDS** that counsel's trial strategy fell within the wide range of reasonable professional assistance guaranteed by the Sixth Amendment; therefore, Hemetek cannot meet the first prong of the *Strickland* test. Moreover, Hemetek did not suffer prejudice as a result of counsel's alleged errors in light of the substantial evidence supporting a conviction.

In *Sexton v. French,* the Fourth Circuit differentiated the types of decisions which must be made by criminal defense counsel as follows:

> There are essentially two categories of decisions made by a criminal defendant's trial counsel: those decisions, deemed "personal," that must be made with the defendant's consent and those that may be made without the defendant's consent. Decisions that may be made without the defendant's consent "primarily involve trial strategy and tactics," such as "what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed." The decisions that must be made with the defendant's consent include the decision to enter a guilty plea, the decision to waive a jury trial, the decision to pursue an appeal, and, as noted in Part III of this opinion, the decision to testify at trial.

163 F.3d 874, 885 (4th Cir. 1998), *cert. denied,* 528 U.S. 855, 120 S.Ct. 139, 145 L.Ed.2d 118 (1999) (citations omitted). Tactical decisions involving trial strategy

include such matters as stipulating to the expertise of a witness, determining lines of questioning on cross-examination, *United States v. Caldwell,* 201 F.3d 437 (4th Cir. 1999) (Table), moving to suppress a confession, *Sexton v. French,* 163 F.3d at 885, and objecting to evidence. *Fitzgerald v. Thompson,* 943 F.2d 463 (4th Cir. 1991), *cert. denied,* 502 U.S. 1112, 112 S.Ct. 1219, 117 L.Ed.2d 456 (1992). The Supreme Court has recognized that "strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengable." *Strickland,* 466 U.S. at 690. The measure of competence in the context of trial strategy is not made by comparing the defense provided to the best possible defense; rather, the measure is whether the strategy employed by counsel was objectively reasonable. *Harrington v. Richter,* –––- U.S. –––, 131 S.Ct. 770, 788-90, 178 L.Ed.2d 624 (2011).

      1.     *Sergeant Starcher*

      Hemetek complains that trial counsel was ineffective because he did not object to Sgt. Starcher's remark that he was acquainted with Hemetek "from other cases." (ECF No. 67 at 4). Hemetek describes a long history of animosity between herself and Starcher that was exacerbated by her divorce from Vaughn ("Bobby") Johnson, a friend of Starcher. Hemetek contends that during and after her divorce from Johnson, Starcher harassed and targeted her. Hemetek recounts that Starcher arrested her twice, once for using a marital credit card during the pendency of the divorce and another time for making harassing phone calls to Johnson following the divorce. Hemetek argues that given her prior history with Starcher, trial counsel should have made a motion *in limine* to prohibit Starcher from making prejudicial comments at trial.

At trial, Starcher was the prosecution's first witness. After answering several questions regarding his background and work history, Starcher discussed his past interactions with Hemetek:

> AUSA Hanks: Do you know the defendant [Hemetek]?
>
> Starcher: Yes, I do.
>
> AUSA Hanks: How do you know the defendant?
>
> Starcher: I've known the defendant for quite sometime [sic] and, also, *on prior cases*.
>
> AUSA Hanks: Is she a resident of the county?
>
> Starcher: Yes, that's correct.
>
> AUSA Hanks: So the individual you know as Kathryn Ann Hemetek, is she here in the room today?
>
> Starcher: Yes, she is. This is her sitting with – it looks like a blue color. I can't tell if it's a dress or – right here on the right side of me at the table.
>
> The Court: All right. He's identified the defendant.

(ECF No. 60 at 20) (emphasis added). Based on this reference to "other cases," Hemetek asserts that "[t]rial counsel was ineffective in that he did not object to this prejudicial remark, wherein Starcher referred to matters that were inadmissible at trial. Her prior contentious dealings with Sgt. Starcher should have been the subject of a motion in limine and objected to at trial." (ECF No. 67 at 4).

The decision to file a motion *in limine* or object to testimony at trial is precisely the type of strategic choice left to counsel and is presumed to be professionally reasonable absent strong evidence to the contrary. Sgt. Starcher's comment was made as part of the prosecution's introduction and identification of Hemetek. Starcher's reference to knowing Hemetek from "other cases" was vague in

nature—Starcher did not state whether Hemetek was a victim, witness, suspect, or perpetrator in these other cases. He did not state that he had previously arrested Hemetek, nor provide details about the nature of the cases. He did not make any reference to Hemetek's arrests for improper use of a marital credit card or for harassment of her ex-husband. On cross-examination, defense counsel effectively dissipated the potential impact of Starcher's words by pointing out that Starcher knew Hemetek as a teacher, had seen her teaching, and had contact with her through his visits to the various schools at which she worked, leaving the impression that the phrase "other cases" might simply refer to those contacts arising from Hemetek's teaching positions. (ECF No. 60 at 45). A decision to object to testimony requires counsel to consider the Rules of Evidence in the broader context of a jury trial. Although prejudicial or inadmissible in nature, a passing remark may draw little attention from a jury. On the other hand, an objection to such a passing remark may serve only to focus the jury's attention on the contents of that remark and give it more weight than it deserves. Given the brevity and vagueness of Starcher's reference to familiarity with Hemetek from "other cases," trial counsel was not professionally unreasonable in deciding not to object to Starcher's testimony.

Similarly, nothing in the record suggests that counsel had reason to file a motion *in limine* pertinent to Sergeant Starcher's testimony. A motion *in limine* is designed to prevent the interjection of specific evidence that is irrelevant, inadmissible, or prejudicial. Given that the United States conveyed no interest in offering evidence of Hemetek's prior arrests by Starcher, trial counsel had no reason to anticipate that related testimony would be introduced at trial. Moreover, a motion *in limine* seeking to prohibit generic, unspecified "prejudicial" testimony would not

have been useful. In order to rule on the admissibility of a question and response, the presiding judge would have to hear them as they arose in the context of the case.

Even assuming that counsel's decision not to file a motion *in limine* or object was professionally unreasonable, Hemetek is unable to demonstrate prejudice from Starcher's equivocal statement. The exclusion of testimony that Starcher knew Hemetek from "other cases" would not have lessened the impact of the remaining evidence offered by the prosecution to support the conclusion that Hemetek was guilty of marijuana cultivation on her farm. The prosecution introduced evidence showing that: numerous e-mails were exchanged from Hemetek's e-mail account to that of a website that sold marijuana seeds; a check with Hemetek's signature was issued on her personal account and cashed by that same website that sold marijuana seeds; Hemetek admitted to a history of marijuana cultivation; Hemetek owned the farm from which over 219 marijuana plants were seized; two of the three plots of marijuana were located on Hemetek's property; the third plot was located directly adjacent to Hemetek's property; there were clear paths between the plots and the paths were well-traveled; water jugs were found on one plot; the plants had been fertilized or planted in potting soil; and planters found in Hemetek's yard matched those found in one of the plots. Moreover, Hemetek's son confirmed that Hemetek had cultivated marijuana on the same land in the past. To establish prejudice under *Strickland*, Hemetek must demonstrate a "reasonable probability that, absent [Starcher's remark], the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. In light of the quantity of evidence introduced against her at trial, Hemetek simply cannot satisfy this requirement.

2.    *Richard Lockhart*

Hemetek's allegations regarding her son's role at trial are puzzling in that she fails to explain what more trial counsel should or could have done to lessen the effect of Lockhart's testimony. Hemetek states that Lockhart was under "undue influence" at the time he gave a statement to the WVSP implicating Hemetek in the cultivation of the marijuana plants found on her property. Citing to an e-mailed statement prepared by Lockhart on October 25, 2010 and attached to her motion to vacate (ECF No. 67 at 12-13), Hemetek explains that Lockhart was a candidate for the WVSP Academy at the time of the eradication effort on Hemetek's farm and was highly concerned that his mother's involvement in marijuana cultivation would have negative consequences on his candidacy application. As a result, Lockhart "spilled the beans" to Cpl. Keefer and signed a statement detailing Hemetek's past involvement in cultivating and selling marijuana. (*Id.* at 13). According to Hemetek, Lockhart "did not have direct knowledge that his mother was implicated in any marijuana cultivation scheme," but did know that Michael Neal was involved in the growing of marijuana on Hemetek's property. Presumably, Hemetek believes that trial counsel rendered ineffective assistance by failing to cross-examine Lockhart regarding the "undue influence" he felt as a result of his candidacy for the WVSP Academy.

At trial, the prosecution questioned Lockhart at length regarding the events of July 22, 2005. (ECF No. 60 at 63–68). Lockhart recalled that at the time he saw police helicopters flying over the farm, he believed there was "probably some marijuana up on the hill that they're coming to get." (*Id.* at 64). He stated that he believed this to be true because his mother and her ex-husband, Vaughn Johnson, had grown marijuana on the property in the past. (*Id.*). Lockhart then described his

conversation with Cpl. Keefer in which he informed Keefer that his mother and her ex-husband had grown marijuana on the property and that he had previously seen marijuana hanging from the rafters in the barn and in his mother's house. (*Id.* at 66–68). Although Lockhart's application to the WVSP had long since been rejected, (ECF No. 84 at 58), he did not recant his prior statement to Cpl. Keefer during his direct examination at trial. Instead, his testimony was consistent with the earlier statement he made to Keefer. Moreover, even in his October 2010 e-mail, Lockhart does not disavow his testimony at trial and again confirms that Hemetek had, in the past, participated in the cultivation of marijuana on her property. (ECF No. 67). Finally, it should be noted that Hemetek, in a conversation with Keefer incident to the eradication effort, admitted that she had grown marijuana on her farm in the past, and Keefer shared that admission with the jury at trial.  (ECF No. 60 at 135).

On cross-examination, defense counsel questioned Lockhart regarding the involvement of Michael Neal and Vaughn Johnson in the prior cultivation of marijuana on Hemetek's property. (*Id.* at 68–69). With Lockhart, defense counsel established Johnson's familiarity with Hemetek's property. (*Id.* at 69–70). Furthermore, through Lockhart's testimony, defense counsel established that other individuals had the means and opportunity to come onto the property without Hemetek being aware of their presence; that Lockhart and his grandfather performed most of the outdoor work on the farm; that Hemetek did not work in the areas where the marijuana was found; that the divorce between Hemetek and Johnson was contentious; and that Johnson continued to live within a mile of Hemetek's property following the divorce. (ECF No. 60 at 70–72). In light of the beneficial testimony elicited in cross-examination, an effort by counsel to impeach Lockhart's statement to

Keefer on the basis of "undue influence" likely would have achieved nothing more than to undermine Lockhart's credibility and nullify any benefit achieved through his cross-examination. It is clear from the transcripts of the trial and sentencing and the affidavits submitted in support of the instant action that Hemetek's trial strategy was to persuade the jury that someone else, either Michael Neal or Vaughn Johnson, was responsible for the cultivation of the marijuana found on Hemetek's property and that she had no involvement whatsoever in the criminal activity. Trial counsel effectively cross-examined Lockhart to draw out this defense. Had counsel demonstrated that Lockhart's personal goals and motives effectively molded his statement to Keefer, counsel would have given the jury a reason to distrust all of Lockhart's statements. A jury could reasonably have concluded that if the prospect of being a trooper convinced Lockhart to implicate his own mother in a crime, the prospect of his mother's conviction for that crime certainly might influence him to implicate others. Consequently, it was eminently reasonable for trial counsel to confine his cross-examination of Lockhart to Michael Neal's and Vaughn Johnson's past behavior, motives, and access to Hemetek's property. Thus, counsel's cross-examination of Lockhart was tactically sound and fell within the wide range of reasonable professional assistance outlined in *Strickland.*

      3.    *Frances Taylor*

Again, Hemetek's motion addressing Frances Taylor's testimony at trial is a brief summary of facts containing no legal argument or focused criticism of counsel. Nonetheless, the undersigned construes this section of Hemetek's motion to make two contentions. First, trial counsel rendered ineffective assistance when he failed to present evidence that directly contradicted Taylor's testimony regarding access to

computers at New Haven Elementary School.[4] Second, trial counsel should have more thoroughly cross-examined Taylor to challenge her credibility and show her bias against Hemetek. According to Hemetek, Taylor had long resented her for disciplining Taylor's grandson at school.

Prior to and at the time of trial, one aspect of Hemetek's defense was to challenge the evidence that she sent or received e-mails from medicalseeds.com. Hemetek suggested that someone else used her e-mail account and sent the e-mails either from her home computer or from a computer in the school's computer lab. Hemetek further intended to show that this person could have easily accessed the school's computer laboratory, opened her e-mail account, and either sent the e-mails, or if the e-mails had already been sent, intentionally left her e-mail account open to the incriminating messages in an effort to implicate her; particularly, as her e-mail password was a matter of common knowledge at the school. The United States offered Ms. Taylor at trial to preemptively refute that defense. Taylor testified that as the secretary at New Haven Elementary School, she was responsible for checking visitors into the school. (ECF No. 60 at 75–78). Taylor described the location of the school's computer lab and the means by which someone would be able to gain entry to the lab. She testified that all visitors had to be "buzzed in" to the school once it was in session and they were then required to report to her office to sign-in before they could access any other part of the school. (*Id.* at 76–77). Defense counsel cross-examined Taylor regarding renovations that were made to the school, implying that

---

[4] Evidence submitted by Hemetek in support of her motion to vacate indicates that renovations were made to the school in 2006, which included installation of a security system. (ECF No. 84 at 32). Thus, Taylor's recollections may have been faulty.

the security steps described by Taylor were not put in place until after the renovations were completed. Taylor testified that even before the renovations were made, visitors had to press a buzzer for admittance into the building when school was in session. (*Id.* at 78–80). Instead of pressing the point, Counsel asked Taylor about a back door to the computer lab. Taylor admitted that the computer lab had a back door, but testified that the door was kept locked. (*Id.*).

The content of cross-examination is a strategic judgment, squarely within the province of trial counsel. Consequently, a reviewing court must give a "heavy measure of deference to counsel's judgments," and, in doing so, may only evaluate the competence of the judgments in light of all the circumstances. *Strickland,* 466 U.S. at 690-91. The decision whether to call a defense witness likewise is "a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which [reviewing courts] must afford enormous deference." *United States v. Terry,* 366 F.3d 312, 317 (4th Cir. 2004) (quotation marks, brackets, and ellipses omitted). In view of the strong evidence substantiating the United States' position that Hemetek authored the e-mails, most persuasive of which was Hemetek's negotiated check to the marijuana seed company, attacking the credibility and bias of Ms. Taylor would have been ineffective and may have been damaging to the defense. Moreover, presenting a witness to contradict Taylor's tangential testimony about the installation of a security buzzer may have confused the jury[5] and would have diverted attention away from Hemetek's central argument that other individuals were responsible for the 219 marijuana plants found on or near her property. Taylor's

---

[5] Price did offer a witness, June Kessinger, a teacher at New Haven Elementary School, to refute Taylor's testimony and substantiate the defense's claim that security was lax at the school in 2005.

testimony did not foreclose the possibility that someone other than Hemetek sent the e-mails; particularly, as the computer containing the e-mails was accessible to teachers, volunteers, students, and parents permitted on site. Accordingly, trial counsel's decision not to call a witness to contradict Taylor's testimony was well within the range of objectively reasonable professional assistance.

Hemetek also is hard-pressed to demonstrate prejudice from counsel's management of Ms. Taylor and the incriminating e-mails. Counsel clarified through the testimony of Cpl. Keefer that the 219 plants found in July 2005 were grown from seeds planted in the Spring of 2005. (ECF No. 60 at 137). Accordingly, 20 seeds purchased and planted in early Spring 2004 could not have been the direct source of the marijuana plants found on Hemetek's property in 2005. Thus, the e-mails were only probative on the issue of Hemetek's prior bad acts under Fed. R. Evidence 404(b).  Even without the e-mails, the jury would have learned of Hemetek's history of marijuana cultivation through the testimony of her son and Cpl. Keefer.  Therefore, Hemetek cannot reasonably show that the outcome of the trial would have been different if counsel had been more aggressive in attacking Ms. Taylor's testimony.

### 4.   *Angela Roach, Blythe Powell, and Lisa Moody*

Next, Hemetek argues that trial counsel rendered ineffective assistance when he failed to properly cross-examine Roach and Powell. According to Hemetek, Roach, Powell, and Moody had a history of harassing her at work, including filing a number of petty complaints against her. Hemetek contends that trial counsel should have introduced these complaints to demonstrate bias against her and undermine the credibility of Roach and Powell. Hemetek further states that Powell had a copy of old complaints Hemetek had filed against Sgt. Starcher and that Powell was a social

acquaintance of Michael Neal and Vaughn Johnson. Hemetek alleges that trial counsel should have cross-examined Powell regarding her friendship with Neal and Johnson to raise doubts about her motives and impeach her credibility. [6]

At trial, Roach and Powell testified about teachers' usage of the computer lab and the discovery of Hemetek's open e-mail account on one of the computers. Roach described her job responsibilities as a technology coordinator, the basic layout of the computer lab, the types of activities that teachers used the computer lab for, and her discovery of Hemetek's open e-mail account on a computer in the computer lab. (ECF No. 60 at 81–92). Powell testified regarding her working relationship with Hemetek and her concerns over Hemetek's personal use of Powell's classroom's computer. She confirmed viewing Hemetek's open e-mail account with Roach and informing the principal of the contents of the e-mail messages. (*Id.* at 96–103).

A review of the trial transcript demonstrates that counsel's cross-examinations of Roach and Powell fell well within the wide range of objectively reasonable professional assistance. In cross-examining Roach, counsel elicited the concession that Hemetek had a classroom computer and a laptop; thus, begging the question of why Hemetek would choose to use a public computer in the school's computer lab to

---

[6] It is unclear what Hemetek contends her counsel should have done in regard to Lisa Moody. Ms. Moody was not a witness at trial. Hemetek's overall theme was to establish the existence of a conspiracy that had as its sole purpose the destruction of Hemetek. Sgt. Starcher was identified as one of the co-conspirators, and Lisa Moody, Sgt. Starcher's sister and a teacher at New Haven Elementary School, was identified by Hemetek as the likely source of the "anonymous" report to the WVSP about the incriminating e-mails found on the school computer. (ECF No. 67 at 4). Still, nothing in the record suggests that any benefit would have been gained by Hemetek through calling Lisa Moody as a witness. Trial counsel's testimony at the evidentiary hearing indicated that he found the conspiracy theories to be too unwieldy and disjointed to cogently present to a jury. Therefore, he decided to keep the defense simple and focused on introducing reasonable doubt about the identity of the person who cultivated the marijuana on Hemetek's property.

order marijuana seeds. (ECF No. 60 at 92–96). Similarly, during counsel's cross-examination of Powell, counsel succeeded in obtaining favorable testimony from Powell that other teachers used the computers in the computer lab and other staff members knew Hemetek's e-mail password. (*Id.* at 103–04). Trial counsel's cross-examination strategy effectively cast some doubt on whether Hemetek actually sent and responded to the incriminating e-mails found on the school's computer; thereby, providing support for Hemetek's assertion that she was the victim of a deception orchestrated by the person or persons who planted the marijuana on her property.

Having found that counsel's performance was objectively reasonable, the undersigned need not address the issue of prejudice. However, as previously stated, the e-mails found on the school computer were only probative of Hemetek's past behavior and were not proof of the crime with which she was charged. Cross-examining Roach and Powell regarding their personal biases towards Hemetek would not have overcome the substantial objective evidence of Hemetek's guilt introduced by the United States.

5.    *Michael Neal*

Finally, Hemetek argues that trial counsel rendered ineffective assistance by failing to call Neal as a defense witness. According to Hemetek, she instructed counsel to subpoena Neal to trial and get him to confess that he was the individual responsible for the marijuana plants on her property.[7] However, counsel failed to follow her instructions. At the evidentiary hearing, Hemetek's counsel testified that he complied with Hemetek's request and subpoenaed Neal to trial. However, upon

---

[7] Hemetek notes that Neal is currently appealing a six month sentence in Ohio for receiving stolen property and that he was recently charged with several drug-related offenses that were dismissed.

learning that Neal did not intend to confess to the crime and, to the contrary, planned to sabotage Hemetek's defense, counsel made the decision to release Neal from the subpoena.      The Fourth Circuit has consistently found that ineffective assistance of counsel is not established where a witness not called to testify would not have helped the defense. *Jones v. Taylor,* 547 F.2d 808 (4th Cir. 1977); *Goodson v. United States*, 564 F.2d 1071 (4th Cir. 1977); *Stevens v. Warden, Md. Penitentiary*, 382 F.2d 242 (4th Cir. 1967), *cert. denied*, 390 U.S. 1031 (1968). In the instant case, Hemetek admits to having a combustible and antagonistic relationship with Neal. (ECF No. 84 at 6, 28). Nothing in the record indicates that Neal would have been willing to admit to any connection with the marijuana and counsel had no direct evidence of Neal's involvement. Given Neal's history, his intense dislike for Hemetek, the significant potential that Neal's testimony would harm Hemetek's defense, and the "enormous deference"[8] afforded to counsel in deciding what witnesses to call, the undersigned finds that trial counsel did not render ineffective assistance.

### B.    Trial Counsel's Failure to Advise Hemetek of Plea and Sentencing Issues

Hemetek contends that trial counsel never informed her of the five year mandatory minimum penalty that applied to the charge contained in the indictment. (ECF No. 67 at 2). Hemetek also asserts that trial counsel did not discuss the possibility of an information plea that would have allowed her to plead guilty to the charge without being subject to the mandatory minimum sentence. (*Id.*). Finally, Hemetek alleges that counsel failed to appreciate or explain to her the potential

---

[8] *Terry*, 366 F.3d at 317.

application of the safety-valve provision, which would have significantly reduced her sentence, and further failed to "preserve her objection" when she was denied a sentence reduction. Before these claims can be addressed, it is necessary to briefly review the applicable law relevant to Hemetek's three contentions.

First, a criminal defense lawyer is unequivocally obligated to advise a client of the maximum sentence the client faces if he or she is found guilty at trial, as well as the sentence range likely to be imposed when entering a guilty plea. A failure to comply with these obligations provides grounds for an ineffective assistance of counsel claim. *United States v. Gordon,* 156 F.3d 376, 380 (2d Cir. 1998) ("[K]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty."); *see also United States v. Gordon,* 156 F.3d 376 (2nd Cir. 1998) (erroneous advice concerning sentence exposure amounts to ineffective assistance); *United States v. Day,* 969 F.2d 39, 44 (3d Cir. 1992) (holding that counsel was ineffective by giving defendant substandard advice about sentence exposure under the Sentencing Guidelines during plea negotiations); *Turner v. State of Tennessee,* 858 F.2d 1201 (6th Cir. 1988) (counsel's advice to reject two year plea offer was ineffective when defendant ultimately received a life sentence), *vacated on other grounds,* 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989), *reinstated,* 726 F.Supp. 1113 (1989), *aff'd,* 940 F.2d 1000 (1991). While the failure of counsel to advise a client of his or her potential sentencing exposure is professionally unreasonable, to prove prejudice under *Strickland*, a defendant must show that, but for "gross misadvice regarding his sentencing exposure," he would have accepted a plea agreement. *See United States v. Merritt,* 102 F. App'x 303, 307 (4th Cir. 2004); *see also United States v. Brannon,* 48

Fed.Appx. 51, 53 (4th Cir. 2002) (holding same).

Second, defense counsel is obligated to "promptly communicate and explain to the accused all significant plea proposals made by the prosecutor." *ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 4-6.2(b) (3d ed. 1993)*. Recent decisions of the United States Supreme Court reiterate that the right to effective assistance of counsel extends to the plea negotiations process, explaining that "[b]ecause ours is for the most part a system of pleas, not a system of trials, it is insufficient simply to point to the guarantee of a fair trial as a backstop that inoculates any errors in the pretrial process." *Missouri v. Frye,* 132 S.Ct. 1399, 1407 (March 21, 2012), *citing Lafler v. Cooper,* 132 S.Ct. 1376 (March 21, 2012). The failure of a defense attorney to timely inform his client of a plea offer constitutes unreasonable professional assistance, satisfying the first prong of the *Strickland* two-pronged analysis.[9] *United States v. Brannon,* 48 Fed. Appx. 51, 54 (4th Cir. 2002) (unpublished). If the defendant can then demonstrate that "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the

---

[9] Within the Fourth Circuit, defense counsel's duties as to plea negotiations are to: 1) notify the client of a plea offer; 2) advise the client of the option to proceed to trial; 3) present the client with the probable outcomes of both the guilt and sentencing phases of each alternative; and 4) permit the client to make the ultimate decision. *Jones v. Murray,* 947 F.2d 1106, 1110–11 (4th Cir. 1991). The Fourth Circuit's sister circuits have similarly found that where defense counsel has failed to inform a defendant of a plea offer, or where defense counsel's incompetence results in a defendants' deciding to go to trial rather than pleading guilty, such conduct constitutes a violation of a defendant's Sixth Amendment right to the effective assistance of counsel. *See Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003) (emphasis removed) ("A defendant suffers a Sixth Amendment injury where his attorney fails to convey a plea offer."); *United States v. Leonti,* 326 F.3d 1111 (9th Cir. 2003) (holding that the failure to communicate a plea offer to a defendant is ineffective assistance); *Ashley v. United States*, 17 Fed. Appx. 306, 308 (6th Cir. 2001) ("Failure to communicate a plea offer to a client may constitute ineffective assistance of counsel."); *Johnson v. Duckworth,* 793 F.2d 898, 900–02 (7th Cir. 1986) (defense counsel should keep defendant apprised of all development in the plea negotiation process and communicate the prosecutor's proposals promptly); *United States ex rel. Caruso v. Zelinsky,* 689 F.2d 435 (3d Cir. 1982) (failure to communicate a plea bargain offer to defendant denied defendant his Sixth and Fourteenth Amendment rights to effective assistance of counsel).

prosecution would not have withdrawn it in light of intervening circumstance), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than the judgment and sentence that in fact were imposed," the defendant effectively establishes prejudice under the second prong of *Strickland. Lafler,* 132 S.Ct. at 1384.

Lastly, "[t]he precedents also establish that there exists a right to counsel during sentencing in both noncapital and capital cases. Even though sentencing does not concern the defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice because "any amount of [additional] jail time has Sixth Amendment significance." *Id.* at 1385-86, *citing Glover v. United States,* 531 U.S. 198, 203, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001) (internal citations omitted). Consequently, if a defendant meets the requirements of the safety-valve provision, 18 U.S.C. § 3553(f), and his lawyer fails to assert his eligibility, then the first prong of the *Strickland* test is met. *United States v. Rodriguez,* --- F.3d. ---, 2012 WL 1193763 (D.D.C. March 9, 2012). To satisfy the second prong of *Strickland*, the defendant must show a reasonable probability that had his lawyer raised his safety-valve eligibility, the district court would have imposed a reduced sentence. *Id.* Indeed, some jurisdictions have held that application of a safety-valve adjustment is not discretionary when the five eligibility requirements are met. *Rodriguez,* 2012 WL 1193763 at * 6.

The safety-valve provision of 18 U.S.C. § 3553(f) "permits shorter sentences for a first-time offender who would otherwise face a mandatory minimum [sentence]." *United States v. Fletcher,* 74 F.3d 49, 56 (4th Cir. 1996). In order to qualify for the safety-valve reduction, a defendant must satisfy the five requirements of § 3553(f):

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and
>
> (5) *not later than the time of the sentencing hearing*, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

(emphasis added). Defendants must "demonstrate, through affirmative conduct, that they have supplied truthful information to the Government." *United States v. Ivester,* 75 F.3d 182, 185 (4th Cir. 1996). Defendant bears the burden of establishing his eligibility for the safety-valve provision by a preponderance of the evidence, which includes the burden of persuading the district court that he has truthfully provided the required information to the United States. *Rodriguez,* 2012 WL 1193763 at * 6; *also United States v. Beltran–Ortiz,* 91 F.3d 665, 669 (4th Cir. 1996). "[B]ecause the burden is on the defendant, the government has no obligation to present evidence of the defendant's failure to satisfy the requirements of the safety-valve." *United States v. Aidoo,* 670 F.3d 600, 606 (4th Cir. 2012). Integral to qualification for a safety-valve adjustment is the defendant's acceptance of responsibility for his or her actions in regard to the offense. *U.S. v. Withers*, 100 F.3d 1142, 1147 (4th Cir. 1996) (citing

*Ivester*, 75 F.3d at 184). Moreover, under the Sentencing Guidelines, "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." USSG § 3E1.1, Note (1)(A).

Bearing in mind the applicable legal standards and after thoroughly reviewing the written materials and taking into account the testimony offered at the evidentiary hearing, the undersigned **FINDS** that the representations of trial counsel are entitled to greater evidentiary weight than the statements of Hemetek. Thus, the undersigned further **FINDS** that Hemetek fails to carry her burden of proof on these claims. Each of Hemetek's plea and sentencing claims are addressed below in turn.

      1.    *Mandatory Minimum Sentence*

Hemetek contends that she was never told that the charge in the indictment carried a mandatory minimum sentence. At the evidentiary hearing, Hemetek testified that during her initial telephone call with Price, she asked him what the penalty would be if she was convicted of the charge and he never mentioned a mandatory minimum sentence. She pressed him on the subject, because she had seen an article in the newspaper that reported a sentence of 5 to 40 years, and he responded that the newspapers "always got it wrong" and her sentence would be "about 18 months to 24 months, two years." According to Hemetek, after their initial telephone call, she met with Price on only two occasions and had someone with her at both meetings who overheard her discussions with Price. She claimed that she repeatedly asked about the potential sentence, but Price never advised her of the five year mandatory minimum. In support of her position, Hemetek offered the written statements of her father, mother, and friend, James Wilson, and the testimony of Mr.

Wilson and another friend, Walter Farmer. These witnesses confirmed that they never heard Price mention a mandatory minimum sentence either.[10]

In contrast, Price testified that he had practiced criminal law for thirteen years at the time he was retained by Hemetek. Many of his federal criminal cases involved drug charges, some of which had mandatory minimum sentences. He recalled that when he first reviewed the indictment against Hemetek, he understood that the charge carried a statutory mandatory minimum sentence because it involved the cultivation of 100 or more marijuana plants. He stated that his custom and practice was to review the indictment with his client, explaining the underlying statute, the penalty, and the client's exposure so that the client could make a decision about how to plead. Price confirmed both at the hearing and by affidavit that he specifically discussed the five year mandatory minimum sentence with Hemetek on more than one occasion.  (ECF No. 81-1).

Several pieces of evidence support Price's testimony that he told Hemetek about the mandatory minimum sentence.  First, Hemetek's recollections are faulty. Her allegation that Price spent very little time speaking with her or constructing her defense is contradicted by the record. While Hemetek claims that she had only two meetings with Price, she most certainly had more. In her First Evidentiary Disclosure, Hemetek writes that at the first meeting, she was accompanied by James Wilson and, at the second meeting, her friends, Wendy Lowe and June Kessinger, went with her. (ECF No. 84 at 8, 10).  At the hearing, Hemetek testified that Mr. Wilson was with her

---

[10] While the undersigned acknowledges that the witnesses appear credible, their statements carry little weight inasmuch as the record confirms that Hemetek and Price also spoke privately by telephone on multiple occasions.

at the first meeting and Mr. Farmer attended the second one. Mr. Wilson confirmed that he went to one meeting with Hemetek and Price, but Mr. Farmer testified that he went to two meetings. Hemetek's father, Frank Hemetek, recalled a total of three meetings between Hemetek and Price. (ECF No. 84 at 27). Accordingly, considering these statements as a whole, there was likely a minimum of four meetings between Hemetek and Price prior to trial, not including the time they spent at the arraignment and bond hearing. Moreover, Hemetek concedes that she spoke to Price on the telephone at least two times in addition to meeting with him in person. Further, it is undisputed that Price met with Hemetek's father twice and met once alone with her son. Accordingly, Hemetek's claim that Price ignored her case, as well as her suggestion that a witness was present at every conversation she had with Price, are simply incorrect. Noting the number of contacts Price had with Hemetek, it is inconceivable that the mandatory minimum sentence was never discussed. To the contrary, it is likely that in keeping with his custom and practice, Price explained to Hemetek the nature of the charge, the potential penalty, and his assessment of her exposure.

Second, Price's handwritten notes confirm that he was aware of the mandatory minimum sentence. (ECF No. 106-1 at 12). Hemetek insinuates that Price was inexperienced and simply did not appreciate that the charge called for a mandatory minimum sentence. However, notes written by Price prior to trial reflect that he calculated Hemetek's sentence at around 27 months, but took into account that this sentence was only possible if no mandatory minimum applied. Clearly, Price was mindful of the statutorily-imposed minimum sentence. Price's notes, although sparse, support his testimony that he worked to obtain a favorable plea agreement for

Hemetek that would avoid imposition of the mandatory minimum sentence.

Finally, as the United States pointed out at the hearing, a written plea offer was sent to Price shortly after Hemetek's arraignment. The plea offer explicitly stated on the first page that the penalty for the crime included imprisonment for a minimum mandatory period of 5 to 40 years. Mr. Price testified that he discussed the plea offer with Hemetek and suggested that she consider entering a plea in light of the evidence against her. As an individual with a master's degree, Hemetek certainly had the intelligence to read and understand the plea offer and likely would have questioned the potential sentence set forth in the document; particularly, as this was the second time the sentence range was reported to be 5 to 40 years. Hemetek has not expressly admitted that she reviewed the plea agreement with Price, but did recall having a discussion with him in which he advised that the punishment under a plea agreement would "be the same thing" whether or not she went to trial. Indeed, Hemetek would have faced the same sentence under the tendered plea agreement as she would if convicted by a jury because the mandatory minimum was still applicable. Hence, Hemetek's statement is consistent with the advice expected from a defense attorney asked about a potential sentence under that plea agreement and strongly suggests that Price made that comment in the context of discussing the plea agreement. All of this evidence, when considered together, makes it more likely than not that Price explained the mandatory minimum sentence and Hemetek understood her exposure.

2.    *Information Plea*

Hemetek's contention that the information plea was not communicated to her also lacks credibility. The record demonstrates that a few business days before Hemetek's trial, AUSA Hanks sent an e-mail to Price agreeing to "work up the chain

for approval to an 0-20 information plea," which would allow Hemetek to avoid imposition of the mandatory minimum sentence. (ECF No. 106-2 at 9). According to Price, after assessing the discovery produced by the AUSA, he determined that the government's case against Hemetek was strong. For "damage control" purposes, Price engaged in conversations with AUSA Hanks seeking a favorable plea agreement; one that would allow Hemetek to avoid the mandatory five year sentence. His efforts culminated in the e-mail from Hanks. Price clearly recalled contacting Hemetek about the e-mail and meeting with her at his office to discuss it. He explained the offer to her and calculated her sentence range under the proposed agreement to be somewhere around two to two and half years. Price testified that Hemetek refused the offer because it required her to surrender her teaching license. Price indicated that throughout his representation of Hemetek, she showed little interest in entering into a plea agreement because a felony conviction would prevent her from teaching in the future. Price testified that Hemetek understood that she was facing a five year sentence if convicted, but opted to go to trial rather than relinquish her license. Hemetek refutes that this conversation took place. She admits that she was concerned about losing her teaching license, but contends that she proceeded to trial because "Price wanted to go to trial" and assured her that "I can win this." (ECF No. 84 at 3, 10).

Once again, the evidence preponderates in favor of Price's version of the events. The record establishes that Hemetek had conversations with Price about a possible sentence in the two-year range. Hemetek and some of her witnesses recalled Price estimating Hemetek's sentence at around two years. Hemetek also stated that Price looked up information in a book to determine the two year range. The timing of

these conversations, however, is unclear. Hemetek contends that they occurred early in her representation and were in response to her questions about the possible term of imprisonment facing her. Price testified that he engaged in these conversations throughout his representation of Hemetek, always in the context of explaining to her the terms of a favorable plea agreement, and certainly these discussions occurred after receipt of the e-mail communication from AUSA Hanks.

A handwritten note made by Price indicates that he certainly was thinking along the lines of a two year sentence after receipt of the e-mail from Hanks. (ECF No. 106-1 at 11). The note includes a sentence calculation based on the terms of the information plea. Another handwritten note confirms that Price calculated Hemetek's sentence as 27 months under the guidelines "if no stat min." (ECF No. 106-1 at 12). These notes support Price's recollections that he addressed the possibility of a two year sentence in the context of explaining the information plea agreement. Moreover, the evidence shows that Price went to some effort to negotiate a favorable plea offer. There is no conceivable reason for Price to have expended that effort if (1) he wanted to go to trial; (2) was sure he would win; and (2) had no intention of sharing a plea offer with Hemetek. Common sense demands the conclusion that Price discussed the information plea proposal with Hemetek upon receipt and, during this discussion, raised the potential of a two year sentence.

Finally, in her First Evidentiary Disclosure, Hemetek inadvertently admits that she knew prior to trial about the proposed information plea agreement. (ECF No. 84 at 10). Hemetek filed the First Evidentiary Disclosure in response to the United States' memorandum in opposition of motion to vacate. The United States attached to its memorandum a fourteen paragraph affidavit executed by Price. (ECF No. 81-1). In

an eight-page, handwritten notarized reply, Hemetek addressed each paragraph of the Price's affidavit, averring in relevant part, as follows:

> **Price affidavit paragraph 6**: Mrs. Hemetek was not interested in taking a plea because she was concerned that a conviction would cause her to lose her teaching license.
>
> **Hemetek response to 6**: "Price told me not to take a plea."
>
> **Price affidavit paragraph 7**: On numerous occasions, I discussed the issue of a plea with Ms. Hemetek or her option to take the case to trial. Each discussion resulted in Ms. Hemetek declaring that she could not plead because she would lose her teaching license.
>
> **Hemetek response to 7**: "Again Price is lying. I even ask him 'what should I do?'"
>
> **Price affidavit paragraph 14**: Ms. Hemetek elected to go to trial knowing that if she were convicted she would be facing a mandatory sentence of at least five (5) years.
>
> **Hemetek response to 14**: "Another lie – ask Price about taking **the 2 year plea** right before trial, and he said 'I can win this.'" (Emphasis added).

(ECF No. 84 at 8-10). These statements by Hemetek establish that she was aware of a "2 year" plea agreement and discussed accepting it with Price. The only proposed plea agreement in this case that allowed for a potential two year sentence was the information plea agreement outlined by the AUSA in his e-mail communication. Accordingly, the undersigned **FINDS** that Price met his obligation to promptly communicate and explain the proposed information plea.

> 3. *Safety Valve*

The final issue is whether Price appreciated Hemetek's eligibility for a safety-valve adjustment and discussed that issue with her prior to sentencing. Hemetek adamantly denies that Price ever mentioned the safety-valve provision or explained its requirements to her. At the hearing, Price admitted that Hemetek did not initially

appear to qualify for safety-valve consideration due to her criminal history points, but clarified that he never abandoned the possibility that Hemetek had misstated her criminal history and could qualify for a reduction after all.[11] According to Price, until completion of the presentence report, which details the defendant's criminal history, the applicability of the safety-valve provision is often uncertain. Price testified that he discussed the safety-valve and substantial assistance provisions with Hemetek and urged her to accept responsibility for the crime or debrief the United States and "flip" on the guys involved in the cultivation, emphasizing to her that the only way to get under the mandatory minimum sentence was to admit the full extent of her knowledge and participation.

It is reasonably probable that the presiding district judge in Hemetek's case would have made a safety-valve adjustment if that option had been available to him. It is also reasonably probable that he would have imposed a sentence below the mandatory minimum. Hemetek now testifies that she would have fully cooperated with the government if she had known that "acceptance of responsibility" did not require her to admit that she cultivated the marijuana. She claims that Price never advised her that she could avoid a five-year mandatory sentence if she revealed what

---

[11] At the hearing, Hemetek attempted to prove that Price never appreciated her eligibility for a safety-valve sentence reduction because he erroneously believed her criminal history points were too high to qualify.  The record is clear that prior to sentencing Price received the presentence report prepared by the Probation Officer and knew that Hemetek had only one criminal history point. It is also clear that Price and Hemetek thoroughly reviewed the report and made several objections and corrections. Hence, it is reasonable to conclude that Price was aware that Hemetek was not ineligible for safety-valve consideration due to criminal history points. In any event, the record establishes that the presiding district judge considered application of the safety-valve provisions at sentencing, but did not apply them because Hemetek failed to meet the fifth and final requirement that she truthfully provide the United States with all information and evidence known to her regarding the marijuana cultivation on her property.

she knew about the individual who had actually grown the marijuana. If her statements could be accepted as true, Hemetek would likely prevail on her *Strickland* claim. However, Hemetek is not entitled to relief because her recollections of the advice given by Price regarding sentencing and acceptance of responsibility simply are not credible when viewed in the context of all of the evidence.

Both parties agree that Hemetek met four of the five requirements necessary to qualify for a safety-valve adjustment. The United States argues that because Hemetek did not meet the fifth requirement—acceptance of responsibility and debriefing—Price was not ineffective for failing to object to the Court's refusal to apply a safety-valve reduction. Hemetek concedes that she did not provide full and truthful information to the government about the marijuana cultivation on her property. However, she reiterates that Price never explained to her that she could receive a reduced sentence under the safety-valve provision without having to admit to the crime of which she was convicted. To this day, Hemetek steadfastly maintains that she is entirely innocent of cultivating the marijuana plants found on her property in 2005. Having analyzed the record, the undersigned **FINDS** that Price did discuss with Hemetek the ways in which she could receive a reduced sentence, but because these options all required her to fully and truthfully confess her knowledge about the marijuana cultivation on her farm, she refused to listen. The undersigned further **FINDS** that Price did not advocate for a safety-valve adjustment or preserve an objection because he knew his client was not eligible for a reduction under the safety-valve provision.

As previously noted, in order to qualify for a safety-valve reduction, a defendant must "demonstrate, through affirmative conduct, that [she has] supplied

truthful information to the Government" prior to sentencing. *United States v. Ivester,* 75 F.3d 182, 185 (4th Cir. 1996). The burden is on the defendant to prove that this requirement has been met. *United States v. Beltran–Ortiz,* 91 F.3d 665, 669 (4th Cir. 1996). Here, at every step of the pre-sentencing proceedings, Hemetek denied any and all responsibility for the crime of her conviction. While it was certainly within Hemetek's prerogative to take her case to trial and argue her innocence, her actions following her conviction and prior to sentencing were inconsistent with the Fourth Circuit's requirement that a defendant acknowledge responsibility for his actions in order to qualify for an application of the safety-valve provision. *U.S. v. Withers*, 100 F.3d 1142, 1147 (4th Cir. 1996) (citing *Ivester*, 75 F.3d at 184); *See also* USSG § 3E1.1, Note (1)(A) ("[A] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."). Despite the jury's factual finding that Hemetek was guilty of the charge against her, and in the face of substantial evidence of her guilt, at her pre-trial interview and at sentencing, Hemetek continued to deny culpability, proclaim her innocence, and argue that "others" were responsible for the marijuana plants on her farm.[12]  Moreover, it is puzzling that Hemetek continues to assert that

---

[12] At the evidentiary hearing, Hemetek's counsel argued that Price apparently misunderstood the law because he advised Hemetek that the United States would have to prove that "she, and she alone" cultivated the marijuana when, in truth, the government only had to prove that she was an aider or abettor or a conspirator. This argument was asserted not as a separate allegation of ineffective assistance of counsel, but as evidence of the overall substandard quality of Price's knowledge and advice. The undersigned does not find this argument to fairly represent the facts. Price testified that he believed the government had to prove that Hemetek actually grew the marijuana, not that she "alone" grew it. In fact, the government consistently took the position that Hemetek grew the marijuana and developed its case based on that premise. The government never suggested that anyone else conspired with Hemetek or participated in the cultivation. Accordingly, Price's testimony at the hearing was consistent with the government's case.

she qualified for a safety-valve reduction when much of the evidence that she has submitted in this habeas action consists of half-truths, inconsistencies, and contradictions of her prior statements. Starting with her protestations regarding the e-mail communications to the marijuana seed distributor, Hemetek was repeatedly untruthful about her participation in the marijuana found on her property. She told the school board's investigator that she did not send the e-mails or recognize the website. She told her attorney that someone else sent the e-mails and framed her. Price's handwritten notes suggest that Hemetek accused her ex-husband, Vaughn Johnson, of arranging for an individual named Steve Jordan to surreptitiously enter her house and order the seeds on her computer. (ECF No. 106-1 at 4, 6). Based on this fabrication, Price built a defense challenging the validity of the e-mails. Only after her conviction did Hemetek finally admit to the Probation Officer that she sent the e-mails and purchased the seeds; but even then, she claimed she purchased the seeds for someone else—the same Steve Jordan she previously accused of wrongfully implicating her.

Hemetek's dishonesty continued with her statements about the marijuana plants found on and near her farm. When initially confronted by law enforcement, Hemetek denied her culpability, but made an unsolicited statement that "she and Mr. Johnson had grown marijuana on the property in the past," undoubtedly trying to suggest that he was the party responsible for the 219 plants, not her. (ECF No. 43 at 6). Hemetek likewise led Price to suspect that Johnson may have planted the marijuana on her property, indicating that he lived near her property, had access to her land, and had a vendetta against her. Price's notes are full of information supplied by Hemetek to implicate her ex-husband in the cultivation. While it is true that

Hemetek subsequently added Michael Neal to her prime suspect list, she clearly never told Price that she *knew* Neal was the culprit. Yet at the evidentiary hearing, Hemetek admitted, apparently for the first time, that she *knew* in the summer of 2005 that Neal was growing marijuana on and near her property. If Hemetek had been candid with Price during his representation of her, Price no doubt would have abandoned efforts to incriminate Johnson and would have focused his energy on a more honest and productive defense. Even as late as December 2011, Hemetek's own family members displayed ignorance of Hemetek's alleged knowledge that it was Neal, not Johnson, who planted the marijuana on her farm.[13] At the hearing, Hemetek testified that Neal made threats against her, implying that she had been afraid to tell the truth about his responsibility for the marijuana plants during her trial and after her conviction. However, that explanation simply does not hold water.[14] By the time the federal indictment was returned in September 2008, it had been nearly two years since Hemetek and Neal had dissolved their relationship. They no longer lived together or even near to each other. Consequently, if Neal was the only one involved in growing marijuana on the farm, Hemetek had no reason to

---

[13] Hemetek's family continues to accuse Johnson for planting the marijuana. Hemetek's mother contends in a statement filed on December 19, 2011 that either Johnson or Neal, or both of them, planted the marijuana. (ECF No. 84 at 30-31). Richard Lockhart complains that neither Johnson nor Neal were prosecuted, although they were "just as likely (if not more likely) to be responsible for the plants." (ECF No. 84 at 57).

[14] Quite honestly, it is difficult to discern what Hemetek knew in 2008 and 2009 because she has offered three different versions of the facts. First, she told her lawyer that she did not know who planted the marijuana but suspected it was Johnson or Neal. Second, she claimed in her First Evidentiary Disclosure that Neal told her *after the trial* in 2009 that he "planted the plants and laughed about me going to prison for his crime." (ECF No. 84 at 6). More recently, she testified at the evidentiary hearing that she knew in 2005 that Neal was responsible for planting the marijuana and cautioned him about the risks of detection during aerial reconnaissance.

protect him; particularly, at her own expense. The only logical explanation for Hemetek's subterfuge is that she feared her personal involvement in the cultivation of the plants would be revealed. Price indicated that more than anything else, Hemetek was worried about losing her teaching license. As such, any admission of guilt or participation on her part certainly would have resulted in the loss of her license. Rather than insure that end, Hemetek presumably decided to take her chances on a trial and then on an appeal. Price, with no other avenues available to him, abandoned his efforts to obtain a sentence reduction based upon truthful disclosures by Hemetek and, instead, assisted her in pursuing a post-sentence substantial assistance reduction by testifying against Neal on a stolen property charge pending in Ohio. However, the United States chose not to recognize Hemetek's post-conviction actions and never moved for a reduction.

After her conviction and prior to sentencing, the Probation Officer concluded that Hemetek still had not truthfully acknowledged her role in the criminal activity, stating:

> The defendant has not demonstrated an acceptance of responsibility for her criminal conduct. Under U.S.S.G. § 3E1.1, Application Note 1(a), it states that acceptance [of] responsibility includes truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3. In this case the evidence presented during trial showed that the defendant is only being partly truthful about her involvement in this offense. Therefore, no offense level reduction as authorized by U.S.S.G. § 3E1.1 is warranted or recommended.

(*Id.* at 7). Her refusal to accept responsibility continued at the sentencing hearing where Hemetek continued to declare her innocence. At sentencing, the Court inquired whether Hemetek wished to say anything prior to his decision. Hemetek

gave the following statement:

> I just know that the whole truth didn't come out and that I did not commit this crime. So I couldn't say that I did something that I didn't do, and I just think that it was unfair that I was singled out for this offense.
>
> (Mr. Price and the defendant conferred privately off the record.)
>
> . . . I mean I accept responsibility because of the jury sentencing. And I just want to be close to my family at Alderson.

(ECF No. 58 at 13). In response, the Court observed:

> If you had pled guilty and been truthful to the officers and the Government about your role in this, even if it involved other people, you would have been looking at a far lower sentence than this mandatory minimum, even under this conviction. We have what's called a safety-valve for a person who meets five characteristics. You meet all of those except, I guess, the most important one, which is that you are required, to get the safety-valve treatment, to accept responsibility for your crime and provide truthful information to the Government about it.
>
> If you had done that, with the other reductions, you'd be looking at a sentence less than half of this mandatory minimum. So I take no pleasure in sentencing you to a mandatory minimum here because I'm puzzled that it had to go this far and that you chose this route, but you're the one who made those choices and now you'll have to suffer the consequence.

(*Id.* at 14–15). Even after listening to the judge, Hemetek made no effort to confess her knowledge and involvement.

Ultimately, the issue presented is whether trial counsel was ineffective for failing to move to mitigate Hemetek's minimum mandatory sentence pursuant to the "safety-valve" provision of 18 U.S.C. § 3553(f). Hemetek provides no persuasive explanation for why trial counsel's conduct should be considered professionally unreasonable. A review of the record reveals that Hemetek was not forthcoming about her involvement in the crime prior to sentencing. Therefore, she did not qualify for the safety-valve reduction at sentencing. Thus, an objection to Hemetek being

denied a sentence reduction for acceptance of responsibility would have been frivolous. Consequently, trial counsel's conduct with respect to the safety-valve provision was professionally reasonable.

## V.    <u>Proposal and Recommendations</u>

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the District Court accept and adopt the findings proposed herein and **RECOMMENDS** the following:

1.      Movant's Application Under 28 U.S.C. § 2255 for Writ of Habeas Corpus by a Person in State or Federal Custody (ECF No. 67) be **DENIED**; and

2.      This civil action be **DISMISSED, with prejudice,** and removed from the docket of this Court.

Movant is notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Movant shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.

*Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Movant, Respondent, and any counsel of record.

**FILED**: April 25, 2012.

Cheryl A. Eifert
United States Magistrate Judge